IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Jeff S. Schultz,                       )
                                       )
        Plaintiff                      )
                                       )
                                       )
    v.                                 )   No. 22 C 4542
                                       )
                                       )
Ruan Transport Corp.,                  )
                                       )
        Defendant.                     )


Memorandum Opinion and Order

The complaint in this case alleges that plaintiff Jeff Schultz was unlawfully fired from his job as a truck yard "spotter" in retaliation for complaining to the Illinois Environmental Protection Agency ("EPA") and to the Occupational Safety and Health Administration ("OSHA") about workplace safety issues and/or for refusing to engage in conduct that he believed was illegal. Mr. Schultz claims that his termination violated Sections 15(b) and 20 of the Illinois Whistleblower Act, 740 ILCS 174/15(b) ("IWA"). After the close of discovery, the parties filed cross-motions for summary judgment, which are now pending. Having reviewed the parties' arguments and the evidence on which they rest, I conclude that even when the record is construed in the light most favorable to Mr. Schultz, it does not reasonably suggest that anyone involved in his termination knew that he had

filed complaints with any government agency, nor does it suggest that he ever refused to engage in conduct he thought was illegal. Accordingly, I grant defendant's summary judgment motion and deny plaintiff's.

I.

The following facts are undisputed except where noted. Mr. Schultz began working for defendant Ruan—a transportation services company—in February of 2021. His job duties included driving a truck to move trailers around a yard operated by defendant's customer, Clarios, in Geneva, Illinois. Mr. Schultz reported to the terminal manager, Brian Curry, a Ruan employee who reported to Ruan's Director of Operations, Ron DeVries. Mr. DeVries was the dedicated operations leader for the Clarios site and was responsible for hiring and firing spotters at that location. Mr. DeVries, however, was based in Ruan's corporate office in Des Moines, Iowa and visited the Clarios yard in Geneva only periodically.

By May of 2021, Mr. Schultz had begun to complain to Mr. Curry and to his union steward, Don Myles, about potholes in the yard, which he said were hurting his tailbone. Mr. Curry told Mr. Schultz that Clarios would fix the potholes, and Mr. Myles offered him a seat pillow to use. Mr. Schultz also complained to Casey Jordan, whom Mr. Schultz describes as his "Ruan recruiter," about the potholes, as well as about the lighting in the yard. Mr.

2

Schultz sent pictures of the potholes to Mr. Jordan in May of 2021.

On September 30, 2021, Mr. Schultz complained to the Illinois EPA that a truck filled with lead battery acid tipped over at the Clarios site and was not cleaned up. On October 18, 2021, Mr. Schultz complained to the Illinois EPA that there was lead dust at the Clarios yard, which he believes caused him to suffer lead poisoning. Schultz Dep., ECF 46-3 at 127-28. At some point prior to his termination, Mr. Schultz also complained to OSHA about the lead, the potholes, and the lighting. *Id*. at 139.

On October 20 and 25, 2021, the Illinois EPA conducted site visits to the Clarios yard. Around the same time, Brian Curry's employment with Ruan was terminated, and Miguel Martinez stepped in to manage Ruan's operations at the Clarios yard from October 26, 2021, until November 4 or 5, 2021. So far as the record reveals, no Ruan employee was present for the EPA site visits to Clarios, nor did anyone from Ruan have any involvement in the EPA investigation of Mr. Schultz's complaints.

Moreover, while the record does contain documents memorializing Mr. Schultz's complaints to the EPA and its ensuing investigation of the Clarios site, none of these documents identifies Mr. Schultz as the complainant or references any contact between the agency and Ruan or its employees. *See* Pl.'s Exh. P-7 to P-8, ECF 53-9 and 53-8. For example, the Complaint

Investigation Form dated December 9, 2021, states that the September 30 complaint was received from "anonymous," while all information identifying the complainant on the October 18 complaint has been redacted.[1] Further, the narrative portion of the form states that investigator Ricardo Ng visited the Clarios site on 10/25/21 and interviewed "Ganesh Krish EHS Leader (Environmental) and Site EHS Leader Melissa Coleman," ECF 53-8 at 2, neither of whom is claimed to be a Ruan employee.[2] No other individuals are identified as having been present for or involved in the site visit. In particular, Ron DeVries, who was responsible for hiring and firing spotters at the Clarios yard and made the decision to terminate Mr. Schultz, testified that he was not involved in any investigations by the Illinois EPA or OSHA relating to Mr. Schultz, nor was he aware that Mr. Schultz had filed complaints with those entities. DeVries Dep., ECF 48-2 at 83:23-84:8.

On November 1, 2021, Mr. Schultz handed Miguel Martinez a grievance concerning the potholes at the yard that had not been fixed. Shortly thereafter, Scott Behrens, Clarios's plant manager, complained to Mr. Martinez that Mr. Schultz was taking pictures of

---

[1] It is not clear from the record when or by whom these redactions were made. But there is no evidence that anyone at Ruan saw any version—redacted or unredacted—of these documents. Plaintiff testified that he did not have unredacted copies of this document in his possession.

[2] At his deposition, plaintiff testified that Coleman was "head of safety" for Clarios and that he did not know who Ganesh Krish was.

the facility, and Mr. Schultz was called into a meeting with Mr. Behrens later that day. Messrs. Martinez and Myles also attended the meeting, and Mr. DeVries was present by telephone. Mr. Schultz confirmed that he had taken pictures at the yard, explaining that Brian Curry had instructed him to take pictures of safety concerns he observed. According to plaintiff, Mr. Behrens "got loud" and told Mr. Schultz that the lighting had been fixed, and that the potholes—some of which had already been repaired, as Mr. Schultz acknowledges, *see* Schultz Dep., ECF 46-3 at 46—would be fixed. At that point, Mr. Schultz became upset and walked out of the meeting. According to Mr. Schultz, his parting words were: "this meeting is done, I'm leaving sick, I'm injured." Mr. DeVries testified, however, that he heard Mr. Schultz say only, "I'm done" before walking out. DeVries Dep., ECF 48-2 at 44:23-45:3 ("[t]he only thing I heard him say was 'I'm done' because that was the only thing that was loud enough that I could hear on my conference call[.]" Mr. Martinez, for his part, recalls Mr. Schultz saying, "I'm sick of this shit, I am done with you, I'm going home." Martinez Dep., ECF 53-5, at 58.

After leaving the meeting, Mr. Schultz visited an urgent care facility where he underwent an x-ray of his tailbone and was told he had "anxiety issues." He received a prescription for several medications and a note writing him off work for five days. Later that night, Mr. Schultz reached out by phone to several Ruan

employees in an effort to notify them that he would not be at work the following day: He called Don Myles and left a message; he then tried Barb Carlson, Ruan's lead dispatcher at the Clarios site, but was unable to reach her. Finally, plaintiff called Joe Kizaur, Ruan's Milwaukee-based head of safety, and explained that he left work injured and had a doctor's note but did not know "how to reach out to anybody." Schultz Dep., ECF 48-1 at 83. Mr. Kizaur gave Mr. Schultz a number to call to arrange for workman's compensation, and he told Mr. Schultz that he would let Ruan's office staff know that he would not be in. *Id*. at 86:10-18. Mr. Schultz followed up with Mr. Myles the following day, November 2, 2021, to let him know that he would be out for a week and had a doctor's note. *Id*. at 85:12-15.

But on November 2, Mr. DeVries told Ruan's human resources representative for the Clarios account that she should advertise for Mr. Schultz's job because he had left after the previous day's conference call saying he was "done." The same day, Mr. DeVries sent an email to Clarios's plant manager, stating, "we have separated employment with [Mr. Schultz]." Def.'s L.R. 56.1 Stmt., ECF at ¶ 38. Finally, on November 4, 2021, Mr. Schultz received an email from Mr. Martinez informing him that he was terminated. The letter stated:

> Please let this letter serve to notify you that because you left during your shift on November 1, 2021 after stating that you were "done" and leaving work and have been absent without notice to your acting manager since

6

that day, you are considered to have voluntarily
resigned your employment with Ruan Transport Corporation
given your indication that you were done working for
Ruan and the fact that you have not communicated with
management since.

The Attendance Policy clearly states, "Employees who are
absent for two consecutive work days without notifying
their immediate supervisor, another member of management
or the Human Resources Department in Des Moines, are
considered to have terminated their employment with
Ruan.

Pl.'s L.R. 56.1 Stmt., Exh. 4, ECF 46-6.

## II.

Summary judgment is appropriate "if the movant shows that
there is no genuine dispute as to any material fact and the movant
is entitled to judgment as a matter of law." Federal Rule of Civil
Procedure 56(a). To prevail, the moving party must demonstrate the
absence of a genuine issue of material fact. *Celotex Corp. v.
Catrett*, 477 U.S. 317, 323 (1986). As to any claim on which the
non-movant bears the underlying burden of persuasion, the movant
can satisfy its summary judgment burden by pointing out "that
there is an absence of evidence to support the nonmoving party's
case." *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 (7th Cir.
1994) (quoting *Celotex* 477 U.S. at 325). The nonmovant must then
"set forth specific facts showing that there is a genuine issue
for trial," *Wiegel v. Stork Craft Mfg., Inc.*, 946 F. Supp. 2d 804,
808 (N.D. Ill. 2013) (quoting Fed. R. Civ. P. 56(e)), which is to
say, he must do more than raise "some metaphysical doubt as to the
material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586 (1986). While I view the record "in the light most favorable to the nonmovant," *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986), "favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (internal quotations and citations omitted).

Section 15(b) of the Whistleblower Act provides: "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 ILCS 174/15(b). To prevail on his claim under this section, Mr. Schultz must show: (1) an adverse employment action by Ruan (2) that was in retaliation (3) for Mr. Schultz's disclosure to a government or law enforcement agency (4) of a suspected violation of an Illinois or federal law, rule, or regulation. *See Sweeney v. City of Decatur*, 79 N.E. 3, 184, 188 (Ill. App. Ct. 2017). Only the second element is in dispute.

To survive summary judgment, Mr. Schultz must offer some evidence that would allow a reasonable jury to conclude that Ruan had a retaliatory motive for his termination. *Williams v. Off. of Chief Judge of Cook Cnty. Illinois*, 839 F.3d 617, 627 (7th Cir. 2016). In other words, he must show a causal link between his

complaints to the EPA and/or OSHA, on the one hand, and his termination on the other. This is where his evidence falters. Although Mr. Schultz complained widely to his colleagues and superiors at the Clarios location about lead, potholes, and lighting issues, he does not claim to have told anyone who worked there that he had also complained about these issues to the EPA or OSHA. At his deposition, he admitted that he did not know if anyone from Ruan knew about these complaints or if anyone from Ruan knew about the EPA's visit to the Clarios site. Pl.'s L.R. 56.1 Resp., ECF 53, at ¶¶ 51, 54; Schultz Dep., ECF 46-3 at 136. And in fact, every Ruan employee who was questioned denied knowing that Mr. Schultz had filed complaints with any government agency. Pl.'s L.R. 56.1 Resp., ECF 53, at ¶ 55.

Mr. Schultz insists that the defendant's stated reason for his termination—job abandonment—was pretextual, since on his account of the facts, he ended the November 1st meeting by telling his supervisors that he was leaving because he was "sick" and "injured," and there is no dispute that he saw a doctor that evening and tried to call various Ruan employees before reaching Mr. Kizaur to say that he would be out for several days, per doctor's orders. And, indeed, Mr. DeVries admitted that he learned from Mr. Kizaur on November 2 that Mr. Schultz saw a doctor for a claimed work injury after leaving the November 1st meeting. DeVries testified that based on Mr. Schultz's statements and

9

conduct at the meeting, however, he believed that Mr. Schultz left with no intent to return. *See* ECF 48-2 at 56:7-10 ("I assumed when Jeff said 'I'm done' that he's leaving the company, I need to find a replacement for him"); *id.* at 57:7-9 ("It's reasonable to expect when somebody says they are done and they storm out that they are not going to work for our company anymore."). Mr. Schultz offers no basis for discrediting DeVries's testimony, but even if a jury could conclude that DeVries knew or should have known that Mr. Schultz intended to return to his job, "[t]he court does not sit as a 'super-personnel' department to decide whether the business decisions of an employer are correct; the court's only concern is whether the employer honestly believed that reason." *Chaib v. GEO Grp., Inc.*, 92 F. Supp. 3d 829, 839 (S.D. Ind. 2015), *aff'd*, 819 F.3d 337 (7th Cir. 2016). Moreover, Mr. Schultz ultimately bears the burden of showing a nexus between his termination and the conduct the Whistleblower Act protects. In other words, even if a jury could conclude that Mr. Schultz's termination was motivated by something other than his putative job abandonment, he can prevail on his claims only if he can show that the real reason was one that the Illinois Whistleblower Act prohibits. *See Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 769, 772 (7th Cir. 1994) ("The question is not whether Rockwell is a benevolent company, but rather whether Rockwell discharged Hiatt for filing workers'

10

compensation claims"). The evidence here simply does not raise such an inference.

"To retaliate against a complainant, decisionmakers must be aware of the complaint." *Hamer v. Neighborhood Hous. Servs. of Chicago*, 897 F.3d 835, 841 (7th Cir. 2018). Mr. Schultz purports to dispute that "no employees of Ruan knew that Plaintiff had filed complaints with any government agencies," but the evidence he cites does not substantiate this dispute. Mr. Schultz points to the *internal* complaints he made to Casey Jordan and Brian Curry and notes that the EPA inspected the Clarios site shortly thereafter; but as noted above, there is no evidence that Jordan, Curry, or any other Ruan employee was aware of the EPA's site visit or had any reason to believe that the EPA was investigating the issues Mr. Schultz had raised internally. Nor does Mr. Schultz's scattershot narrative of the events following his contentious meeting on November 1, 2021, *see* Pl.'s L.R. 56.1 Resp., ECF 53 at ¶ 55, offer any basis for inferring that that anyone at Ruan knew about Mr. Schultz's EPA or OSHA complaints. Accordingly, his claim for retaliation under Section 15(b) of the Whistleblower Act does not survive summary judgment.

Section 20 of the Whistleblower Act provides: "An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." 740 ILCS 174/20. To prevail on

11

this claim, plaintiff must establish that (1) he refused to participate in an activity that would result in a violation of a state or federal law, rule, or regulation, and (2) his employer retaliated against him because of that refusal. *Sardiga v. N. Tr. Co.*, 948 N.E.2d 652, 656–57 (Ill. App. Ct. 2011). "There are two aspects to such a claim: (1) the refusal to participate; and (2) the violation of a statute, rule, or regulation." *Perez v. Staples Cont. & Com. LLC*, 31 F.4th 560, 574 (7th Cir. 2022). Defendant argues that Mr. Schultz's claim under this section fails at the threshold because he never refused to participate in the conduct he claims was unlawful: driving the "spotting horse," i.e., the mini truck used to pull trailers, on public roads. At his deposition, Mr. Schultz testified as follows:

> Q: …did you ever refuse to participate in any activity that if you had participated in it, it would have violated some State or Federal law? A: Yes. Q: And what was that? A: I drive their spotting horse on the road with a trailer that breaks law. … Q: Okay. So did you refuse to do that? A: No. I told them about it, but they said they've been doing it for years.
> …
> Q: So did you continue to drive the truck on the road?
> A: Yes, I did.

Schultz Dep., ECF 48-1, at 174:1-175:2, 176:20-22. Mr. Schultz testified that "during his employment," he told both Mr. Myles and Mr. Martinez that it was illegal to drive the spotting horse, including when he handed Mr. Martinez the grievance concerning the potholes on November 1, 2021. *Id.* at 176:11-17. But he admits that after doing so, he continued to drive the truck on the road at Mr.

Martinez's direction. *Id.* at 176:14-22 ("So I handed that grievance, and I also told him, you know, by the way, you know, us driving that truck on the road is illegal. Q: And what did he say? A: Just get out there and go to work. Okay. Q: So did you continue to drive the truck on the road? A: Yes, I did."). That Mr. Schultz later left the job site after meeting with Messrs. Behrens, Martinez, Myles, and DeVries—a meeting at which he does not claim to have discussed the legality of driving the spotting horse—does not plausibly suggest that he was terminated for refusing to engage in that conduct.

III.

For the foregoing reasons, defendant's motion for summary judgment is granted, and plaintiff's motion for summary judgment is denied.

ENTER ORDER:

_____

**Elaine E. Bucklo**
United States District Judge

Dated: May 30, 2024

13